VICKY HARVELL, as next friend of )
JEREMY TRAMMELL WILLIAMS, )
)
Plaintiff/Appellee, )
) Appeal No.
) 01-A-01-9706-CH-00258
VS. )
) Maury Chancery
) No. 95-673
MARY WILLIAMS, )
)
Defendant/Appellant. )

**FILED**

**January 14, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CHANCERY COURT OF MAURY COUNTY
AT COLUMBIA, TENNESSEE

THE HONORABLE JIM T. HAMILTON, JUDGE

WILLIAM S. FLEMING
207 West Eighth Street
P. O Box 90
Columbia, TN 38402-0090
        Attorney for Plaintiff/Appellee

JANET C. DAVEY
711 North Garden Street
P. O. Box 631
Columbia, TN 38402-0631
        Attorney for Defendant/Appellant

AFFIRMED AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# **O P I N I O N**

The trial court declared that a piece of residential property held in the name of the defendant was subject to the equitable remedy of a resulting trust for the benefit of her grandson. The defendant argues on appeal that the plaintiff was not entitled to such a remedy because he did not meet the required burden of proof, and because of the doctrine of unclean hands. We affirm the trial court.

## I.

In November of 1994, Richard Frank Williams purchased at auction a residential lot in Columbia and a mobile home, paying $30,000 in cash for the property. The deed named his mother Mary Williams, as grantee. Though the deed recited receipt of "the sum of TEN DOLLARS ($10.00) and other good and valuable considerations," the parties agree that Mrs. Williams did not actually furnish any consideration for the property, and she testified that she had no idea that her son had bought any property until a deed with her name on it arrived in the mail.

Mr. Williams moved into the home with his girlfriend Vicky Harvell, and their son Jeremy Trammel Williams, who had been born on July 18, 1989. Mr. Williams and Ms. Harvell had been living together since 1988. They never married, but Jeremy was legitimated by an order of the Juvenile Court of Maury County on November 8, 1991. He was the only child of Richard Frank Williams.

Richard Williams died on August 6, 1995 at the age of twenty-nine. After his death, Mary Williams allegedly threatened to have Vicky Harvell and Jeremy removed from the property. Ms. Harvell subsequently brought suit as next friend of Jeremy to impose a resulting trust on the property for the child's benefit. Mary Williams argued at trial that the property was a gift to her, and that her son intended for her to retain both the legal and the equitable title.

The trial court heard testimony by Vicky Harvell, and by the decedent's father, his mother, his sister, and his best friend. The court concluded that it was the decedent's intention that the property go to Jeremy, his only child, and it established a resulting trust for Jeremy's benefit. This appeal followed.

## II. The Adequacy of the Evidence

A resulting trust arises from a transaction where one party becomes vested with legal title to property under circumstances that obligate that party to hold the legal title for the benefit of another. *In Re Estate of Roark,* 829 S.W.2d 688, 692 (Tenn. App. 1991). Such circumstances include, "where the property is purchased and the title taken in the name of one person, but the purchase price is paid by another; and where the purchaser pays for the land but takes the title in whole or in part in the name of another." *Browder v. Hite*, 602 S.W.2d 489, 492 (Tenn. App. 1980), quoting *Gibson's Suits in Chancery*, Fifth Edition, Section 977.

The burden of proof required to establish a resulting trust is always on the plaintiff, and the proof must be clear and convincing to establish such a trust by parol evidence, in the face of the terms in a written instrument. *Estate of Wardell v. Dailey*, 674 S.W.2d 293, 295 (Tenn. App. 1983). The appellant relies upon apparent contradictions in the testimony of the various witnesses at trial to argue that the proof was not clear and convincing that Richard Williams intended for his son to take a beneficial interest in the property.

The testimony of Ms. Harvell, of Mr. Williams' father, and of Andre Amos, the decedent's best friend, were all to the same effect, that the decedent told them that he bought the property to provide a home for his son, and so that if anything happened to him, Jeremy would have a place to stay. Ms. Harvell and Mr. Amos

further indicated that Mr. Williams did not take the deed in his own name because he wanted to avoid taxes and because he was afraid of government seizure.

The decedent's mother, Mrs. Mary Williams, and his sister, Wanda Williams, denied that Mr. Williams had ever mentioned to them that he wanted Jeremy to have the property. They testified to the effect that he put the property in his mother's name because he didn't want Ms. Harvell locking him out, and he didn't want another man living with her on his property if he was out of the picture.

This apparent contradiction in testimony can be best explained by presuming that both versions of Mr. Williams' intentions are accurate. He wanted the property to go to his son, but he also didn't want Ms. Harvell to have the power to dispose of the property in a way that might be contrary to his own interest or that of his son. If he sought the advice of an attorney, he might have been advised to set up an express trust for the benefit of Jeremy, but he apparently acted without legal counsel.

All the witnesses are in agreement that the decedent was very close to his son, that the two enjoyed each other's company, that they did many things together as father and son, and that providing for his son was a high priority for Mr. Williams. The decedent was very indulgent with toys and gifts. He paid child support into the court so that Jeremy, who has an asthmatic condition, would qualify for medical insurance through Tenncare. He bought a small candy store for Ms. Harvell so she would have a source of income to support Jeremy if Mr. Williams could no longer provide for him.

There is no evidence in the record that in deeding the property to his mother, Mr. Williams intended for her to move into the mobile home, to evict Jeremy, to collect rent from Ms. Harvell, or to do anything whatsoever with the property except

to hold the deed. In fact, Mrs. Williams testified that she had no intention to move into the home after her son's death, and only began thinking of doing so after she and Ms. Harvell had a falling-out.

Richard Williams visited his mother on a daily basis, and there is no doubt that he was devoted to her. Mary Williams lived in the same house for most of her life. The house was not titled in her name, but in the name of a cousin in Nashville. Mrs. Williams did not pay rent, but did pay the taxes on the property. Over the years, Richard Williams put a new roof over the home of his mother, put new floors in the kitchen, bedroom and porch, and arranged for gas heating to replace an old wood heating stove. The implication is clear that he intended for her to be comfortable in the house she was already living in, and this court finds the evidence clear and convincing that he also intended that his son be comfortably and securely housed in the residence he provided.

### III. The Clean Hands Doctrine

Testimony at trial indicated that while Richard Williams held down several legitimate jobs before his death, including operating a car wash and detailing shop with his father, and sanding fenders for Saturn, he also allegedly dealt in illegal drugs. The proceeds from his drug-dealing apparently enabled him to pay cash for the property in dispute, and he was worried that the discovery of his illegal activities could lead to negative tax consequences or forfeiture of the property. He therefore decided not to buy the property in his own name.

The appellant reminds us of the maxim of equity that "He who comes into equity must come with clean hands." We note that the doctrine of unclean hands must relate to the particular transaction which is the subject of the ligitation, and not to collateral matters. *Chappell v. Dawson*, 202 Tenn. 672, 676, 308 S.W.2d 420, 421

(1957). Thus, the inequitable conduct at issue here is not the alleged drug dealing by the decedent, but his attempt to fraudulently place the property beyond the reach of potential creditors, such as the I.R.S and the Department of Justice.

If Mr. Williams himself were before this court, and attempting to regain the property for his own benefit, then his prior conduct would prevent him from enlisting the aid of equity to obtain the remedy he seeks. ". . . [I]t is settled in this state by an unbroken line of decisions that a party guilty of fraud is not entitled to be relieved from its consequences." *Thomas v. Hedges*, 27 Tenn. App. 585, 592, 183 S.W.2d 14, 16 (1944); *McCallie v. McCallie*, 719 S.W.2d 150, 154 (1986). However, the plaintiff in this case is a seven-year old boy who is not guilty of any wrongdoing, who has lost the protection of a loving father, and whose interest in a stable residence is now held hostage to a dispute between his mother and his grandmother. We do not believe that it is equitable to impose the doctrine of clean hands upon him.

The appellant points out that the case of *Thomas v. Hedges*, supra, also stands for the proposition that the fraud of the grantor binds his heirs:

> "[t]he test is whether the ancestor, if alive, could have repudiated the deed for the fraudulent purpose . . . . If he could not do this, then the complainants as his heirs could not; for they are in privity of estate with him. They claim only through him as heirs, and hence have no higher or greater rights than he had."

183 S.W.2d at 16, 27 Tenn. App. at 591-2.

While we know of no case that has specifically reversed *Thomas v. Hedges* on this question, our Supreme Court has indicated that even if the general rule as enunciated above is valid, it is not absolute.

In *Burleson v. McCrary*, 753 S.W.2d 349 (Tenn. 1988), the Court dealt with a situation where the remaining heirs of a grantor sought to establish a resulting trust on property that the grantor had deeded to two of the heirs before his death, in

order to prevent the property from passing through his estate, where it would be subject to his medical debts.  Though the appellant insisted that the heirs "stand in no different position from that which [the grantor] occupied," the court stated:

> "It is pointed out by appellant that the grantor may have had an illegal purpose in mind, to frustrate legitimate creditors; but among his children no policy of the law precludes the granting of a resulting trust, particularly where the grantee was a party to the alleged improper purpose and had knowledge thereof."

753 S.W.2d at 353.

While there is no proof in the present case that Mary Williams was a party to her son's alleged improper purposes, or that she had actual knowledge of them, her contention that he intended to make her a gift of the subject property is not supported by any evidence.  We therefore agree with the trial court that the equities of this case support the granting of a resulting trust to Jeremy Williams.

### IV.  Consideration

The appellant makes one other argument, which we believe may be disposed of easily.  She argues that the recital of pecuniary consideration in the deed creates a conclusive presumption, in the absence of fraud or mistake, of an intention that the grantee is to take the beneficial interest in the estate.  However, we agree with the appellee that the presumption in question arises to bind the grantor only where the grantor himself is seeking to obtain the beneficial interest, in the face of his own recital of consideration.  See *Greene v. Greene*, 38 Tenn. App. 238, 272 S.W.2d 483 (1954); *Latshaw v. Latshaw,* 787 S.W.2d 9 (Tenn. App. 1989).

In the present case, the grantor received actual consideration for title to the property, but is not arguing that he retained the equitable interest in the face of that consideration, and the grantor is in fact not even a party to these proceedings. The presumption would apply if Richard Williams had obtained the title to the property

in his own name, conveyed it to his mother by a deed which recited consideration, and then sought to retrieve the equitable title for his own benefit.

**V.**

The judgment of the trial court is affirmed.  Remand this cause to the Chancery Court of Maury County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.


_____
BEN H. CANTRELL, JUDGE


CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
WILLIAM C. KOCH, JR., JUDGE